

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

**FILED**

**OCT 2 6 2004**

CLERK, U.S. DISTRICT COURT
By _____
                Deputy

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF TEXAS, ex rel. JENNIFER HUDNALL, | § § § § |
| Plaintiffs, | § § |
| v. | § § |
| THE CITADEL GROUP, INC. d/b/a The Citadel Group | § § § § |
| and | § § |
| RES-CARE, INC. d/b/a Educare Community Living Corp., Educare Community Living - Normal Life, Inc., Educare Community Living - Texas Living Centers, Inc., Educare Community Living Corp. Texas, Educare Community Living Corp. - America and Educare and others unknown | § § § § § § § § |
| Defendants. | § § |

CIVIL CASE NO. 3-01-CV-1154-K

## STATE OF TEXAS' SECOND AMENDED COMPLAINT

### I. PRELIMINARY STATEMENT

This is a civil action by the State of Texas based upon information provided by Jennifer Hudnall and other former employees of Defendants to recover damages, civil penalties and other relief on behalf of the Medicaid program funded by State of Texas and the United States arising out of corporate driven schemes by a national healthcare provider to defraud the State of Texas and the United States in violation of the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.001 et seq., and Texas common law.  In March of 2003, the State of Texas intervened in the Relator's *qui tam* complaint  filed with this court on or about June 18, 2001.  The State joins in the

legal and factual allegations raised by the Relator in her initial complaint as delineated below, while continuing its investigation of any and all other allegations that have or may come to light.

## II. PARTIES

1.      Plaintiff is the State of Texas, through the Office of the Attorney General (hereafter "State"). Because the Texas Medicaid Program is jointly funded by the State and the United States, the State maintains the authority to recover funds for both the State and the United States pursuant to the Texas Medicaid Fraud Prevention Act.

2.      Relator, Jennifer Hudnall, is a citizen of the United States of America who resides in Saginaw, Texas.   Through her employment with Defendants, Relator obtained direct and independent knowledge of the Defendants' fraudulent activities and schemes.

3.      Defendant Res-Care, Inc. (hereafter "Res-Care") did business in Texas as Community Alternatives of Texas until November 18, 2002, and is a for-profit corporation with its principal place of business at 10140 Linn Station Road in Louisville, Kentucky.  Service of process for this Defendant has been waived, and this Defendant has made its appearance it this matter.

4.      The Citadel Group, Inc. d/b/a The Citadel Group (hereafter "Citadel") is a wholly-owned operating entity of Res-Care. Citadel was formerly known as Citadel Mental Health Services, Inc.   Citadel's Registered Agent is **Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company at 701 Brazos Street, Suite 1050, Austin Texas 78701.** Service of process for this Defendant has been waived, and this Defendant has made its appearance in this matter.

5.      Educare Community Living Corporation-America (hereafter "ECLC America") is a foreign business corporation doing business in Texas.  ECLC America's principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223.  ECLC America is also a subsidiary of

Peopleserve, Inc., which merged with Res-Care, Inc. in 1999. ECLC America may be served by and through its registered agent, **Corporation Service Company d/b/a CSC-Layers Incorporating Service Company, at 701 Brazos Street, Suite 1050, Austin, Texas 78701.** ECLC America has waived service of process in this matter.

6.       Educare Community Living Corporation - Gulf Coast (hereafter "ECLC Gulf Coast") is a domestic business corporation doing business in Texas. ECLC Gulf Coast's principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223. ECLC Gulf Coast is a subsidiary of Defendant Educare Community Living Corporation-America. ECLC Gulf Coast may be served by and through its registered agent, **Corporation Service Company d/b/a CSC-Layers Incorporating Service Company, at 701 Brazos Street, Suite 1050, Austin, Texas 78701.** ECLC Gulf Coast has waived service of process in this matter.

7.       Educare Community Living Corporation - Texas (hereafter "ECLC Texas") is a domestic business corporation doing business in Texas. ECLC Texas's principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223. ECLC Texas is a subsidiary of Defendant Educare Community Living Corporation-America. ECLC Texas may be served by and through its registered agent, **Corporation Service Company d/b/a CSC-Layers Incorporating Service Company, at 701 Brazos Street, Suite 1050, Austin, Texas 78701.** ECLC Texas has waived service of process in this matter.

8.       Educare Community Living - Texas Living Centers, Inc. d/b/a Texas Living Centers (hereafter "ECL Texas Living Centers") is a domestic business corporation doing business in Texas. ECL Texas Living Centers' principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223. ECL Texas Living Centers is a subsidiary of Defendant Educare Community Living-Normal Life, Inc. Texas Living Centers may be served by and through its registered agent,

**CT Corporation System, at 350 N. St. Paul Street, Dallas, Texas 75201.** ECL Texas Living Centers has waived service of process in this matter.

9.      Educare Community Living - Normal Life, Inc. (hereafter "ECL Normal Life"), formerly known as Normal Life of North Texas, Inc., is a domestic business corporation doing business in Texas. ECL Normal Life's principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223. ECL Normal Life is the parent company of Defendant ECL Texas Living Centers. ECL Normal Life may be served by and through its registered agent, **CT Corporation System, at 1021 Main Street, Suite 1150, Houston, Texas 77002.** ECL Normal Life has waived service of process in this matter.

10.      Educare Community Living Limited Partnership d/b/a Alternative Business Services and formerly known as Texas Community Alternatives Limited Partnership (hereafter "ECL LP") is a foreign limited partnership doing business in Texas; its principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223. ECL LP is a subsidiary of Defendant Res-Care, Inc. ECL LP may be served by and through its registered agent, **CT Corporation System, at 350 N. St. Paul Street, Dallas, Texas 75201.** ECL LP has waived service of process in this matter.

11.      Community Alternatives Texas Partner, Inc. (hereafter "CATP") is a Delaware for-profit corporation; its principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223. CATP is a subsidiary of Res-Care, Inc. CATP can be served by and through its registered Agent, **CT Corporation System, at 350 N. St. Paul Street, Dallas Texas 75201.** CATP has waived service of process in this matter.

12.      Texas Home Management, Inc. (hereafter "THM") is a Delaware for-profit corporation; its principal office is located at 10140 Linn Station Road, Louisville, Kentucky 40223. THM is subsidiary of Res-Care, Inc. THM can be served by and through its registered agent, **CT**

**Corporation System, at 350 N. St. Paul Street, Dallas Texas 75201.** THM has waived service of process in this matter.

13.    Citadel Management Group, LLC is a domestic corporation; its principal office is located at 12708 Riata Vista Circle, Suite A-116, Austin, Texas 78727-7180. Citadel Management Group, LLC was formed in 2000, and contracted with Res-Care to provide management services to the Citadel facilities. Citadel Management Group, LLC's initial Members, Jay Burcham and Dennis Henegar, are also Executives for Defendant Citadel. Mr. Henegar is also a co-founder of Educare. After the formation of the Citadel Management Group, LLC, Mr. Burcham continued signing the Medicaid Rehabilitative Services Under Arrangement Contract between Defendant Citadel and Travis County MHMR in his capacity as Vice President of Operations for Defendant Citadel; the address for Defendant Citadel on the contract is identical to the address for Citadel Management Group, LLC.  There is no discernable distinction between the two entities; one is simply a division of the other. Therefore, the State's references to "Citadel" hereafter will include The Citadel Group, Inc. and The Citadel Management Group, LLC, unless otherwise specified.  Although Citadel Management Group, LLC is a division of Defendant Citadel, and in light of Citadel Management Group, LLC's retention of separate counsel in this matter, Citadel Management Group, LLC can be served by and through its registered agent, **M. Gayle Rolland, J.D., C.R.M., at 12708 Riata Vista Circle, Suite A-116, Austin, Texas 78727.** Citadel Management Group, LLC has waived service of process in this matter.

### III. JURISDICTION AND VENUE

14.    This Court has jurisdiction over the state law claims pursuant to 31 U.S.C. § 3732(b) as the state claims arise from the same transactions and occurrences as the concurrent federal False Claims Act action. This Court has personal jurisdiction over the parties because Ms. Hudnall resides

within the Northern District of Texas. Res-Care, Citadel, and Educare have conducted and continue to regularly conduct business in this District.

15.     Venue is proper within the Northern District of Texas pursuant to 28 U.S.C. §§ 1391 (b)(1) and (2) because Defendants Citadel and Educare are located within and conduct business within this District.  Citadel serves patients from its Dallas area location near Coit Road and currently provides home and community-based services throughout Texas.  The illegal conduct charged herein occurred within the Northern District of Texas.

## IV. BACKGROUND

### A. Public Care of the Indigent Developmentally Disabled

16.     In the late 1960's, care of the indigent developmentally disabled was left primarily to the states.  During this time period, most indigent developmentally disabled patients were housed in state run institutions.

17.     In the late 1970's, Medicaid and disability funding were expanded to include care of the mentally ill.  As a result of this expansion, government spending on care for the disabled has risen from $3.4 billion in 1977 to more than $22 billion in 2000.

18.     Fueled by the great influx of government funding, a decentralized, privately owned system of caring for the developmentally disabled has emerged, ranging from traditional institutions to residential community-based living.

19.     In recent years in the United States, only severely disabled individuals are institutionalized, while the vast majority of patients reside in either group homes or private residences.  As such, the need for organizations that can provide home and community-based services to the mentally ill has increased dramatically.

---

20.     Res-Care, a Kentucky for-profit corporation, is one such organization that provides home- and community-based services to the mentally ill, as well as many other types of services. Currently, Res-Care offers services in three distinct areas: Services for people with disabilities, services for youth with special needs, and services for adults with barriers to employment.

21.     During the 1990's, Res-Care began to expand rapidly through acquisitions of other privately owned health care providers. As a result of its multiple acquisitions, Res-Care now owns and operates facilities in Texas, Kentucky, California, Georgia, Arizona, Florida, Illinois, Kansas, Missouri, Nebraska, Nevada, Oklahoma, Pennsylvania, Delaware, Maryland, New Jersey, North and South Carolina, Virginia, West Virginia, Colorado, Indiana, Alabama, Louisiana, Ohio, New Mexico, Tennessee, Washington, and Washington, D.C. These facilities receive a large portion of their funding from state Medicaid programs which are in part funded by monies from the United States.

22.     Res-Care currently employs 29,000 people in 32 states. Its Division for Persons with Disabilities offers services for people with developmental and other disabilities, including mental retardation, mental illness and acquired brain injuries. These services are provided through supported living, supported employment and rehabilitation programs, community group homes, and facility-based operations.

23.     Res-Care began doing business in Texas in 1992. In 1993, it also set up another company, Texas Home Management, Inc., which began operating facilities as well. Between 1993 and 1999, Res-Care had purchased roughly 138 facilities in Texas; it then acquired by merger ECLC - America, two of its subsidiaries (ECLC Gulf Coast and ECLC Texas), its parent corporation, PeopleServe, Inc., and many more facilities. Around the same time, one of Res-Care's subsidiaries converted from a corporation to a limited partnership, and subsequently all of the variously named

Res-Care entities changed their names to include the name "Educare". Many of these companies operate under one company in Texas called Educare Community Living, L.P., formerly known as Texas Community Alternatives Limited Partnership, a Res-Care subsidiary. In 2000, some of the officers and founding members of the various Educare entities and The Citadel Group, Inc. formed a management company called The Citadel Management Group, L.L.C. ("management company"). The management company's initial Members, Jay Burcham and Dennis Henegar, were also Executives for Defendant Citadel. Mr. Henegar was also a co-founder of Educare. After the formation of the management company, Mr. Burcham continued signing the Medicaid Rehabilitative Services Under Arrangement Contract between Defendant Citadel and Travis County MHMR in his capacity as Vice President of Operations for Defendant Citadel. The address for Defendant Citadel on the contract is identical to the address for the management company. In addition, the management company contracted with Res-Care to handle the day-to-day operations of the Fort Worth facility and continued to operate as one with The Citadel Group, Inc. under the name The Citadel Group, Inc. Despite the management company's retention of its own attorney in this matter, there is no discernable distinction between the two entities; one is simply a division of the other and the State considers them one and the same. In fact, Defendants Citadel and Res-Care's own organizational charts include the management company as a subdivision of The Citadel Group, Inc. All of the management company's other executives were also executives of the various Educare entities. The Citadel Group, Inc. is a provider of psycho-social rehabilitation services to patients with developmental disabilities.

24.     Res-Care, after its recent acquisitions, is now the nation's leading provider of services to people with developmental disabilities.

---

25.     Res-Care's rapid and aggressive acquisition strategy often makes it difficult for others outside the company to determine all the Res-Care controlled entities. It is even more difficult when some of the facilities are operating under variously named Educare entities and others are operating under other various Res-Care subsidiaries. When Res-Care first entered the Texas market, it used two names while operating its facilities: Texas Home Management and Res-Care. In fact, in October of 1998, the Texas Department of Human Services ("TDHS"), the agency responsible for licensing the various facilities owned by the Defendants, cited Res-Care for failing to accurately report to the TDHS that 37 facilities acquired by Res-Care had not been properly reported to the TDHS as part of Res-Care. All of these entities, with the exception of the Citadel Management, list their principal place of business as 10140 Linn Station Road in Louisville, KY, the same address as Res-Care. In documents filed with the Securities and Exchange Commission, the various Educare entities are treated as though they are part of Res-Care. In management speeches to shareholders, in press releases and in annual reports, Educare is represented as nothing more than a division of Res-Care.

26.     Notwithstanding the confusion surrounding Res-Care's corporate structure, the fact remains that Res-Care, Citadel, and Educare have, based upon the ongoing investigations of the State of Texas, committed unlawful acts as defined by the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.002. Res-Care, Citadel, and Educare are referred to collectively hereafter as "Defendants."

27.     Alter ego is one basis in law for disregarding the corporate fiction when there is such unity between a corporation and an individual that an adherence to the fiction of a separate existence would, under the particular circumstances, sanction a fraud or promote an injustice.

---

28.     Another basis in law for disregarding the corporate fiction is the "single business enterprise" theory.  Under this theory, when corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for the debts incurred by the other component entities in pursuit of that business purpose.  Factors relevant to determining whether a "single business enterprise " is present include common employees, common offices, centralized accounting, payment of wages by one corporation to another corporation's employees, common business name, services rendered by the employees of one corporation on behalf of another corporation, undocumented transfers of funds between corporations, and unclear allocation of profits and losses between corporations.

29.     The State alleges that Defendants are a single business enterprise.  Alternatively, Citadel and Educare are no more than alter egos of Res-Care.  In order to avoid a situation such that Res-Care might shut down either the Citadel or Educare Division or the Division might be unable to pay damages awarded, the State prays this Court will invoke the doctrine of alter ego to avoid manifest injustice.

## B.  Citadel Operations in Texas Through TDMHMR

30.     The Texas Department of Mental Health/Mental Retardation ("TDMHMR") was created in 1965 to serve individuals of all ages with mental illness and mental retardation.

31.     TDMHMR currently serves approximately 550,000 Texans with some form of mental illness and/or functional impairment.

32.     TDMHMR delegates responsibility to community MHMR centers to provide and maintain programs for individuals with mental illness.

33.     The community MHMR centers can choose to provide the services or subcontract to a rehabilitative service provider within the community.  These services are referred to in Texas as

services "under contract." "Providers" under these programs, or as a provider under arrangement with other "providers," are required to provide services that are paid for by Medicaid under rules promulgated by the Texas Medicaid program. Res-Care's Citadel Division is one such large subcontractor of the community MHMR centers.

34.    There are currently forty-one community MHMR centers throughout the State of Texas. Individuals requiring mental health services contact these community MHMR centers which then refer consumers to the appropriate providers, such as Res-Care's Citadel Division.

35.    Citadel claims to specialize in meeting the needs of people of all ages with chronic and severe mental illness and other behavioral challenges through programs that extend into the community.

36.    Res-Care has contractually promised that it will operate its program within the scope of the rules and regulations set forth in the Medicaid Program established by the United States and the State of Texas. Approximately, ninety-four percent (94%) of the Citadel's consumers receive their care and training through community-based programs, which include group homes, private residences, outpatient day programs and supported living programs. Many of their services are reimbursed by the Texas Medicaid Program.

37.    When a consumer is eligible for services, an agency such as the Tarrant County MHMR ("Tarrant County") will refer the person to several companies, such as Citadel, and the consumer can elect which company will provide the services. The company elected, in this instance Citadel, then receives payment for services rendered by billing Tarrant County who, in turn, pays the bill with monies received from the Texas Medicaid Program. Throughout this Second Amended Complaint, the names of consumers are not used to protect their privacy.

## C. The Texas Medicaid Program

38.     At all times material to this Complaint, Title XIX of the Social Security Act of July 30, 1965 (Title 42, United States Code, Section 1396, et seq.) established a medical assistance program known as the Medicaid Program. Medicaid is a health insurance program administered by the respective states and jointly paid for by each state and the United States Government.

39.     Medicaid was designed to assist participating states in providing medical services and durable medical equipment to families with dependent children, to the aged, the mentally infirm, the blind, and to totally disabled individuals, whose incomes and resources are insufficient to meet the costs of necessary medical services.

40.     The Texas Medical Assistance (Medicaid) Program became effective September 1, 1967 under the provisions of Title XIX of the Federal Social Security Act and Chapter 32 of the Texas Human Resources Code.

41.     The cost of Medicaid is shared by the State and the federal government. Health care providers submit claims of Medicaid eligible individuals to receive reimbursement. By submitting Medicaid claims, each provider agrees to abide by the policies and procedures of Medicaid as expressed in the Texas Human Resources Code and the Texas Administrative Code.

## D.  The Texas Medicaid Fraud Prevention Act

42.     Texas enacted its Medicaid Fraud Prevention Act in September 1995. Civil liability under this state statute attaches when a defendant commits an unlawful act, more specifically when the defendant knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact.

43.     In addition, liability attaches when persons conspire to defraud the state by obtaining unauthorized benefits payments from the Medicaid program.

---

44.     Further, liability attaches when a defendant knowingly or intentionally makes a claim for services that have not been approved of or acquiesced in by a health care practitioner or provides services which are inadequate or inappropriate.

45.     A private person relator who brings an action under the Texas Medicaid Fraud Prevention Act is entitled to at least ten percent (10%), but not more than twenty-five percent (25%) of the proceeds recovered.

46.     The Texas State Medicaid Fraud Prevention Act allows any person having information regarding an unlawful act to bring an action for himself (the "Relator" or *"qui tam* Plaintiff") and for the government to share in any recovery. The complaints are initially filed under seal to enable the State to: (a) to conduct their own investigation without the Defendants' knowledge, and (b) to determine whether to intervene in the action or move to dismiss the action.

## V.  FACTS:

47.     The State of Texas, through the Attorney General of Texas, was served a *qui tam* complaint and written disclosures alleging violations of the Texas Medicaid Fraud Prevention Act. Upon receipt of the *qui tam* complaint, disclosure and material documents, the Office of the Attorney General began an investigation. The investigation has revealed many relevant facts, including the following.

48.     On or about June 19, 2000, Ms. Hudnall responded to a newspaper advertisement placed by The Citadel Group seeking Qualified Mental Health Providers (QMHPs). Ms. Hudnall faxed her resumé to The Citadel Group. Shortly thereafter, she received a telephone call requesting her to come in for an interview. The Regional Director of The Citadel Group, Inc., Tom Sevier, interviewed Ms. Hudnall on or about June 22, 2000. Shortly thereafter she was offered a position.

49.     On or about June 23, 2000, Ms. Hudnall completed her new hire paperwork, including an employment application which referenced Citadel's affiliation with Res-Care; she began her position as a QMHP on or about June 26, 2000. A review of Ms. Hudnall's employment related paperwork revealed papers bearing various Defendants' names, such as Educare Community Living Corporation - North Texas, Res-Care, Inc., Educare Community Living - Texas, Citadel, The Citadel Group, and Texas Home Management.

50.     In addition to its interview with Ms. Hudnall, the State interviewed former QMHPs and other employees, such as Julie Mattson, Amy Skiles, Laura Pimlott, Deborah Ann Tiffin, Debra Tiffin, Belinda Tuck, Scott Irwin, Janet Dibble, Manda Sanz, Amanda Bottoms, Isabel Alford, Anthony Cole, Tracy Fletcher, Teresa Blackburn, Angela Graves, and others employed by Defendants. These interviews revealed that these QMHPs and employees had been employed as early as February 1999 and left the employ of Citadel-Ft. Worth as late as November 2002, the relevant time period covered by the allegations in this Second Amended Complaint. The interviews revealed that the QMHPs were hired to be either individual (off-site) or group (on-site) trainers, or both. On-site QMHPs performed their job duties in the offices of the Citadel-Ft. Worth, whereas off-site QMHPs traveled, usually to where the individual resided. The QMHPs were also known as Group or Individual Trainers, or Rehabilitation Specialists. The QMHPs revealed that they were paid by Res-Care and that Res-Care materials were used during their training.

51.     The State interviewed Tracy Lopez, a former program manager of the Defendants, that was employed by Defendants from August 1999 to July 2001. Her job responsibilities were to supervise and provide training to the QMHPs and to manage the group training program in the Citadel-Ft. Worth location. Among her specific duties were hiring and firing individuals who perform the functions of the QMHPs, reviewing and editing the progress notes created by the

QMHPs, supervising the work of the QMHPs, providing training to the QMHPs, and assuring transportation for the consumers.[1] Her supervisor was Tom Sevier and she did everything in accordance with his orders and the orders received from Citadel management. Progress notes at Citadel, according to Belinda Tuck, had a threefold purpose: to provide consumer feedback, to provide evidence of progress for MHMR to decide whether further services were necessary, and to provide a record to MHMR that the consumer was receiving training. The progress notes were supposed to be turned in at the end of every class.

52.     The State's interview with this former program manager revealed that she had been instructed in the documentation of progress notes. A progress note is a Citadel generated form that is to be filled out by the QMHP when services are provided to a consumer in either a group or individual training session. Its purpose is to document, among other things, the length of time spent training the consumer (shown by the start and ending time, e.g. 9:00 a.m. to 11:01 a.m.), the name of the consumer, training subject, topic, participation comments and progress comments. She revealed that the progress note was the basis for the bill ultimately submitted to Tarrant County for Medicaid reimbursement. After the progress note was completed, it was turned over to the program manager for review and approval. If approved, it was transcribed into the computer system and a hard copy was generated and given to the QMHP for review and signature. If the handwritten note was not approved by the program manager, it was returned to the QMHP for corrections, additions or deletions, and then re-submitted. According to the QMHPs and a program manager, the progress notes had to be turned into the program manager no later than the end of the day, but in general within 30 minutes of the end of the class.

---

[1] "Consumer" as used herein is defined as "the Medicaid eligible individual who is eligible and in need of rehabilitative services, which are reimbursable by Medicaid. TDMHMR Retardation Rehabilitative Services Provider Manual, August 2000.

53.     The duties of Ms. Hudnall and the other off-site QMHPs were as follows. Each week Ms. Hudnall received a list with between six and twelve consumer names. These consumers were located throughout North Texas. Ms. Hudnall would contact each consumer and schedule a convenient time to go to the consumer's home to perform a patient assessment and training. In addition to these duties, Ms. Hudnall also was told by her supervisors that she would serve as a group trainer as needed.

54.     Consumer assessments were supposed to be performed to establish the consumer's needs and develop an appropriate and individual treatment and training plan for that consumer. Ms. Hudnall was responsible for developing a treatment plan that would afford the individual consumer the greatest opportunity for improvement. The consumer assessment was done through the use of a Citadel document labeled Community Integration Program (CIP). The assessment was to be used to determine the needs of the individual consumers and to create the treatment plan. The treatment plan was created during a discussion with the consumer and was to include goals and a schedule of small group or individual training programs that the consumer would participate in during the next ninety days.

55.     The on-site QMHPs provided group training in a classroom setting with no more than eight individuals per QMHP. Additionally, on-site QMHPs performed consumer assessments and used this information to select appropriate small group training programs for the consumers. The training programs were to assist the individuals with symptom management, community skills and employment skills.

56.     Citadel prepared a weekly schedule detailing which training sessions were available. Those training sessions, which were conducted by the group trainers, included expressive communication, community skills, receptive communication, job readiness, appropriate decision

making, responsibility, accountability and consequences, time management, social skills, attention span deficits, simple injuries, personal interaction, health and hygiene, symptom stress management, respect of self, cultural awareness, anger management and money management.   Under Texas Medicaid, the aforementioned therapy sessions are reimbursable, if properly conducted.

57.   Additionally, QMHPs were instructed to coordinate and supervise Citadel-sponsored parties, contests, and auctions on Friday afternoons.   These activities were attended by the consumers.

58.   As a requirement of employment, the QMHPs, both individual and group, were to bill a certain number of billable units per week.   A billable unit was defined as 30 minutes of training time with the consumer.   The billable unit was reimbursed by either Medicaid, Medicare, or a private payor.

59.   Interviews with several of the QMHPs and rehab providers such as Isabel Alford, Manda Sanz and Belinda Tuck revealed that they were fresh out of college, had no experience providing care to the mentally ill, and received approximately 16 to 32 hours of training prior to providing training to the mentally ill consumer, with some training coming from persons whom Manda Sanz understood were without certification.   Several expressed concerns that they had no training on the individual needs of their assigned consumer and no guidance on different approaches in order to optimize the training experience of the individual consumer.

60.   The State interviewed Deborah A. Tiffin, a former secretary, and Belinda Tuck, a program manager.   Both revealed that Citadel used a proprietary software program named "Progression" to input data regarding the consumers and to electronically generate a bill to Tarrant County.   The system was owned by Res-Care, and when the operations of Citadel-Ft. Worth

terminated in November 2002, Res-Care required that the hardware and program be returned to its Louisville, Kentucky headquarters.

61. Tom Sevier, according to the interview conducted with Janet Dibble, was hired as program manager with Citadel-Ft. Worth in the first half of 1999. His duties included hiring and firing group and individual QMHPs, training the group and individual trainers and general supervisory duties. Shortly after Mr. Sevier was employed, he raised the billable hours required of the QMHPs from 25 hours per week to 30 hours and then, shortly after that, to 35 hours per week. On or about April 2000, he was named Regional Director of the Citadel Dallas-Ft. Worth Region.

62. At all times material to this Second Amended Complaint, Citadel-Ft. Worth had a contract to provide services to Medicaid eligible individuals at its facilities and through its employees. The contract was in effect for the years 1999, 2000, 2001, and 2002 and, during those years, Citadel-Ft. Worth was reimbursed with Medicaid money for services allegedly provided to individual Medicaid eligible recipients.

63. Res-Care, by and through its Citadel Division, has engaged in other complex schemes to defraud, deceive and misrepresent to the State of Texas and the United States. These schemes include, but are not limited to, the following examples.

### The Creation of Fraudulent Records

64. Former QMHPs revealed that they were trained and instructed to document information on the progress notes that was fraudulent, misleading and false. The instructions were given to them by Tom Sevier and other program managers employed by the Defendants. For example, Amanda Bottoms revealed that Mickie Burcham, a Citadel executive and mother of Jay Burcham (VP of Operations for Citadel and a founding Member of The Citadel Management Group, LLC, together with Dennis Henegar), encouraged trainers to falsely document progress notes. It was

further understood that the original instructions came from Citadel management. One such instruction to the QMHPs was to never document that the consumer was sleeping during the training session, instead to state that consumer was disoriented or inattentive. During training, Isabel Alford was instructed by Belinda Tuck to never say a consumer slept in class. In another instance, Teresa Blackburn was reprimanded by Tom Sevier for writing a progress note that reflected that the consumer was asleep in class. Written and oral instructions given to the QMHPs from Tom Sevier and program managers were that Medicaid would not reimburse Defendants if the consumer was asleep. This instruction was given to the QMHPs during their training and again after either Tom Sevier or the program manger had reviewed the individual consumer's progress note with that particular description.

65. The Res-Care/Citadel training manual on Small Group Progress Note preparation specifically directs the QMHPs to perform such fraudulent documentation as: "never state patient did not participate or slept in class." Instead, write the patient "listened" because "Medicaid states listening is participating."

66. The QMHPs admitted to having consumers that slept in class. They admitted to writing progress notes that did not accurately reflect that the consumer was in fact sleeping, but instead noted that the consumer was either disoriented or inattentive. According to Debbie Tiffin, if someone wrote "no progress," on a note, Debbie would go and see why they wrote that and see if another choice could be substituted. Debbie stated that she knew consumers fell asleep. Progress in this case would be documented as little or poor. The QMHPs admitted to including time that the consumer slept in class when recording time for billing purposes and then submitting that time for processing. If the notes were not written as instructed, the author would be subject to reprimand from supervisors such as Tom Sevier, Mickie Burcham or Belinda Tuck.

67.     For example, according to Ms. Hudnall, one patient, who will be identified as Barbara, a heavily medicated schizophrenic, was routinely scheduled for group therapy. Due to her medicated state, Barbara slept though many of her classes and individual training. In order to receive compensation for the medically unnecessary treatment, the Res-Care/Citadel staff would fabricate case notes to make it appear as though Barbara was fully participating. In reality, she was napping.

68.     Another example came from an interview with Isabel Alford, a QMHP. Ms. Alford was employed from approximately December 2001 to March 2002. She informed the State that consumers in her class would sleep and she would document on the progress note that they were "disoriented" instead of "sleeping". She was instructed to do this by Belinda Tuck, her supervisor and program manager.

69.     Teresa Blackburn was a QMHP that was employed from July 2000 to approximately May 2002. She wrote a progress note that reflected "no progress" because the consumer was sleeping during the class. She was reprimanded by Tom Sevier and Debbie Tiffin and told that if she did this again, she would not be paid. Thereafter, she falsified the notes of sleeping consumers by writing that they made "little progress." Teresa had to teach classes to interest three levels of functioning: low, middle and high. The consumer assessments that were done at the point of initial contact did not identify level of functioning. These community integration programs assessments were not usually completed by the consumer; Teresa was asked to talk to the consumer and put whatever answer she felt was best, but was instructed not to select the "always" answer.

70.     The QMHPs were instructed to bill for training time when the consumer was not in the training class but was still on the bus coming to the Citadel for training. For example, according to Laura Pimlott, at the Fort Worth facility, trainers would start billing time for consumers although the bus was running late. The bus was often running twenty or thirty minutes late, so this became a

common occurrence. According to Amy Skiles, billing instructions would change depending on the supervisor. Amy stated that in some instances, trainers were instructed to bill for time if the bus was late or if consumers had not shown up for class.

71.    The Texas Administrative Code unequivocally states Medicaid reimbursement for rehabilitative services will only be granted for patients who are present, awake and participate in their treatment. See 25 TEX. ADMIN. CODE § 419.462(e).

72.    Another instruction the QMHPs were given by Tom Sevier and the program managers was not to document that the consumer(s) made no progress, but instead to use minimal progress or poor progress or another descriptive phrase that obscured the true situation. This instruction was given to the QMHPs during their training, and again after either Tom Sevier or the program manger had reviewed the individual consumer's progress note with that particular description. The reason for the instruction was that the services might not be re-authorized if the consumer was not benefitting from the training, or the progress note might reflect that the training was ineffectual. Each QMHP admitted instances in which consumers made no progress, but instead the QMHP would write on the progress note a phrase or sentence that would obscure that reality. These progress notes, the State was told, contained billable QMHP time and were processed for payment. For example, Belinda Tuck revealed that students fell asleep during her classes. In such instances, she tried to wake the consumers up and engage their attention. The sleeping in class would NOT be documented in a progress note. Instead, Belinda wrote that the consumer "showed poor progress" or was "unable to respond." As a teacher, Belinda personally only dealt with a sleeping consumer in approximately two instances but when Belinda was a program manager, she dealt with consumers having to be driven home on an average of three times per week due to their inability to stay awake

during class. In such an instance, the consumer was billed up until the time at which s/he left the classroom.

73.     As stated above in Paragraphs 52 and 64, the QMHPs were responsible for filling out the progress notes and received training on this duty from Tom Sevier and other program managers. The instructions they received, which were reinforced after Sevier or the program manager reviewed a particular progress note, was that progress notes were to include a comment made by the consumer that indicated that the consumer had some understanding of the training topic. For example, Tracy Fletcher said that trainers had to finish writing notes by the end of class. Each consumer would sign their note at this time. Another trainer would review the notes and turn them into Tom. Trainers would receive the notes back with edits. Trainers would have to remove mention of "sleeping" or "no progress." Nonsensical statements would be removed. Citadel allowed the trainer to correct statements without having to talk to the consumer. Trainers could also make up a statement so that the note would make sense. Tracy admitted that untrue statements were written, and attributed to a consumer that had not, in fact, made the statements. Tom Sevier required that the trainers make these edits.

74.     One QMHP indicated that her progress notes were returned to her with instruction from Tom Sevier to put such a comment into the note. Unfortunately, and Sevier knew or should have known this, the consumer would be gone, so the QMHP added comments that she personally attributed to the consumer but, in reality, were never said by the consumer. The note would then be returned to Mr. Sevier, approved by him, and submitted for reimbursement.

75.     Other QMHPs indicated to the State that their progress notes included fictional information. All of the QMHPs indicated that Tom Sevier and the program managers knew that there was information in the progress notes that was false, because an individual note would be

corrected after the consumer had left and the original characterization of the consumer's involvement was different from the revised progress note.

76.     On or about June 26, 2000, Ms. Hudnall's supervisor, Debbie Tiffin, reviewed with Ms. Hudnall Citadel's "corporate" policy on how to write a consumer assessment which would pass muster with Medicaid. Ms. Tiffin instructed Ms. Hudnall to be sure never to write "the patient made no progress" on any consumer records, even if it was an accurate statement. Rather, Ms. Tiffin instructed Ms. Hudnall to "take whatever small positives she might observe and 'stretch it' to make sure it would appear as though the consumer made progress."

77.     QMHPs were instructed to backdate treatment plans. Treatment plans are required to be reviewed every ninety days. 25 TEX. ADMIN. CODE § 412.315(c)(1999). The QMHPs and program managers indicated that they were instructed by Tom Sevier to backdate treatment plans to the Medicaid required due date. In fact, Ms. Tiffin stated that she was acting on the instruction of Citadel's Regional Director, Tom Sevier, when she verbally instructed Ms. Hudnall and the other QMHPs to "backdate" patient treatment plans to ensure Medicaid coverage would not lapse. Not only was this instruction verbally ordered, it was documented in a memo dated July 14, 2000. The memo was from the office manager to the QMHPs, showing a copy to Tom (Sevier), and, in part, stated:

> "Please find the attached list of treatment plans (conference plans) due for the month of July. Note . . . some are VERY past due! Please be sure to back date to the date on the list." Attached was a list of consumers whose treatment plans were lapsed.

Another example, was provided by Julie Mattson. She said that for treatment plans not completed within a certain time frame, she too was instructed to backdate by Tom Sevier. In one instance, Julie had to backdate a treatment plan which was for a time prior to her employment at the Citadel. When

she told Tom that she was not employed at that time, he asked her if she was questioning his authority. Other times, Ms. Mattson had to backdate for consumers whose caseloads she assumed from other trainers. Other trainers have similar stories of backdating key documents upon which Tarrant County relied in making their assessments of Citadel's consumer population.

78.     Shortly after she began working at Citadel, Ms. Hudnall was directed to participate in a party sponsored by Citadel in celebration of the July 4th holiday. All Citadel consumers were invited to attend the party. The total number of Citadel consumers was in excess of eight. The entertainment at the party consisted of face painting, watermelon eating contests and wet sponge throwing contests.

79.     At the end of the party, Ms. Tiffin instructed all Group Leaders, such as Ms. Hudnall, to bill Medicaid for the entire day. Ms. Tiffin, who knew or should have known that Medicaid would not pay for the aforementioned party activities, instructed her staff to falsely bill the patient time under a Medicaid approved category to ensure payment instead of accurately documenting the activity which would not result in payment by Medicaid. Other examples are: Belinda Tuck said she documented the party activities in the notes as "a Citadel function" rather than a "party." Isabel Alford said that during the parties, the trainers would write their notes and bill for the party. Anthony Cole told that the party would get billed as a part of the class that was going on at the same time. It was pure social time. Teachers would either be writing notes or interacting with consumers at the parties.

80.     From the outset of her employment and learning of Res-Care's illegal policies, Ms. Hudnall objected to the fraudulent and illegal practice of creating false documents to support billing practices that Ms. Tiffin and Tom Sevier instructed her to perform. Ms. Tiffin ignored Ms.

Hudnall's concerns and left Ms. Hudnall with the undeniable understanding that all Res-Care staff members were expected to create false documents and false claims or they would be terminated.

81.     QMHP interviews have indicated that the instructions to backdate and to falsify documentation made them feel unethical and uncomfortable, but they were told by Tom Sevier and the program managers that it was part of their job and to do it. In one instance, a QMHP told Sevier that his instructions were unethical and he became irate, and within a few days gave that QMHP a written reprimand. Pamela Johnston told Amanda Bottoms that she had been told by Jay Burcham, an officer of The Citadel Group, Inc., to do "some things that she did not feel were right." Amanda believed that Pamela did not wish to document certain things, and when she refused to do so, the management turned the situation around and branded Pamela as fraudulent. Other workers such as Isabel Alford simply quit because of the stress created by being forced to engage in wrong and unethical practices.

82.     The impact of these fraudulent notes was to mislead the Tarrant County LPHA about the consumer's true situation. For example, according to Julie Mattson, LPHAs from Tarrant County would come to the facility to do their Plan of Care Oversight, review trainers' progress notes and meet with the consumers. This progress would determine how many units the LPHA would authorize for continued services. The trainers' progress notes could potentially give a LPHA the false impression that a consumer needed services that were not really necessary.

### Billing For Services Not Performed or Unnecessary

83.     As stated in Paragraph 52, the progress note was the basis for the bill submitted for reimbursement; among other things, it contained the amount of time spent training the consumer on a particular subject. This time was submitted for reimbursement for training. Each consumer is

authorized a specific number of units per ninety day cycle.  The number of units authorized are determined by the amount of treatment each consumer needs.

84.    Several of the QMHPs indicated that the actual amount of time dedicated to training in the group sessions was far less than reflected in the progress note.  In reality, the time submitted for reimbursement for training also included an unreasonable amount of time spent by the QMHP writing the note during class, when s/he should have been teaching.

85.    QMHPs such as Angela Bottom, for example, said that while they wrote the notes during the class, the consumers would be playing games, watching movies or coloring.

86.    The pressure to fill out a progress note with all of the required information, the requirement to turn the progress note in fairly soon after the class ended, and the requirement of 35 hours of billable hours per trainer per week caused the QMHPs to write a majority, if not all, of the progress notes for a particular session during class time.  The QMHPs stated that if they complained to Sevier and the program managers about this situation, they would be told it was a requirement of the job and they needed to do it.  Further, a QMHP relayed that Tom Sevier said the order to increase billable hours came from Citadel headquarters in Austin, Texas.  Janet Dibble explained, for example, that the classes were approximately 2 hours long and Medicaid was billed for 2 hours. There was one 15-minute break.  Each note for each consumer took eight to nine minutes.  If there were 8 consumers, then another 64-72 minutes was eaten away during which no training was provided to consumers.  Janet further acknowledged that "shell" notes were used to get around the time constraint.  Angela Bottom, for example,  explained that "shells" were notes which were completed before the class even started. All she would do is fill in the consumer name and start time, the result being that the note did not actually reflect the actual activity that occurred during the training.

---

87.     As stated in Paragraphs 57 and 79, Citadel-sponsored parties were held on Friday afternoons during the last group training sessions.  The QMHPs interviewed related that the last group sessions on the schedule for Friday involved training in Communication/Social skills.  The routine was that the QMHPs were to conduct approximately 20-30 minutes of training.  The time in the class was to be used for training the consumers on the particular topic; sometimes the QMHP would do some training, sometimes the QMHP would write progress notes.  Then each group would adjourn to a large common area or room and a party would occur involving all of the small groups. Sometimes an auction would also be conducted.  The QMHPs were to continue to train the consumers on communication or social skills during this period and observe.

88.     QMHPs were instructed not to document that a party took place.  The instruction was both verbal and in the Defendants' training manual.  Specifically, the staff was instructed to conceal the time spent at auctions and parties under a reimbursable Medicaid approved topic heading.  The manual states: "In the past there have been several notes written about the auction or an on-site party". . . "To C.Y.A. it is better to leave out the activity in the note."

89.     The QMHPs stated that they would be so busy arranging and conducting the party/auction that no real training was accomplished.  QMHPs described that they would also use the time to catch up on progress notes and other documentation.  It was also reported that some of the QMHPs would go into another room away from the party and write notes while the remaining QMHPs ran the party.

90.     QMHPs indicated that they would document in such a way as to make it appear that they had conducted training during the party and would document that the consumer had participated in the training, when in reality there was no training and the comments or behaviors did not occur. The QMHPs stated that it was rarely documented on the progress note that the consumers were at

a party. The progress note would document training time for the entire time period and be submitted for reimbursement.

91.     The Texas Administrative Code defines "a small group" as "[a] service delivery modality involving two to eight individuals and at least one staff." 25 Tex. Admin. Code § 419.454(22).

92.     Interviews with the QMHPs indicated that the parties on Friday afternoons, which were billed as small group classes, were routinely attended by more than eight consumers. Belinda Tuck, for example, estimated that forty to forty-eight consumers attended the Friday parties.

93.     According to State officials with the Medicaid Program, even if the party was a specific treatment for the individual consumer, the large number of individuals present rendered the party activity as non-billable as a small group activity.

94.     Several QMHPs stated that they provided group services to individuals who did not need the particular group training being provided. Angela Bottom said that some of her students did not need the skill training she was providing for them. Many students repeated the same classes over and over again. Angela would help write addendums to treatment plans so the consumers could fit into a particular class. The primary criteria was that of Tarrant County, which dictated which consumers were excluded from taking a particular class. Unless Tarrant County said specifically not to assign a certain consumer to a particular class, consumers were assigned to every class whether or not they needed it.

95.     The QMHPs indicated that the group training was authorized in the consumers' treatment plans. The treatment plan contained the group training programs that were authorized for each particular consumer.

96. The QMHPs stated that they were ordered by Tom Sevier and program managers to include all group training classes in the treatment plans. Anthony Cole explained that every class had to be listed on the treatment plan because sometimes a class that a consumer might want would be full. This would ensure that a consumer would take a class for which they could bill. If Mr. Cole missed writing down a class, management would bring it to his attention to add it to the plan. Mr. Cole stated that sometimes a consumer would get put in a class that did not suit his/her needs. The reasons given by Tom Sevier and the program managers were that, in the event a group class was full, another class would be available for the consumer to attend and, thus, no billable opportunity would be lost.

97. The QMHPs indicated that they had consumers in their class that did not need the instruction or who had taken that particular so often that the consumer was bored with the training.

98. For example, according to Ms. Hudnall, there was one patient, who will be identified as Donald, who was a high-functioning, well-adjusted patient. Donald was routinely placed in a basic first aid class designed to teach consumers how to apply band-aids. The Citadel staff was well aware that this training was medically unnecessary. When Ms. Hudnall asked Donald what he learned in that class he responded: "Nothing, it's just something to do."

**COUNT ONE**
**VIOLATION OF § 36.002(1) OF THE**
**TEXAS MEDICAID FRAUD PREVENTION ACT**

99. Paragraphs 1 through 98 are incorporated into Count One as if fully set forth below.

100. This is an action brought by the State of Texas against Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel, under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.002(1).

---

101. Res-Care, through its wholly owned operating division, Citadel, their agents and employees, knowingly and intentionally made false statements and misrepresentations of material facts on applications for payment under the Medicaid Program in order to obtain Medicaid reimbursement for mental health and rehabilitative services that were never performed, or performed at a time which was beyond the Medicaid prescribed requirements. Res-Care, through its wholly owned operating division, Citadel, their agents and employees, also knowingly and intentionally made false statements and misrepresentations of material facts which were intended to be used to determine a person's eligibility for a benefit or payment under the Medicaid program.

102. The State of Texas and its Medicaid carriers, intermediaries and agents, unaware of the false statements and material misrepresentations made by Defendants, have paid and continue to pay these false and misrepresented claims.

103. As a result of Defendants' actions, the State of Texas and its Medicaid Program has been, and may continue to be, severely damaged.

**COUNT TWO**
**VIOLATION OF § 36.002(3) OF THE**
**TEXAS MEDICAID FRAUD PREVENTION ACT**

104. Paragraphs 1 through 98 are incorporated into Count Two as if fully set forth below.

105. This is an action brought by the State of Texas against Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel, under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.002(3).

106. Res-Care through its wholly owned operating division, Citadel, their agents and employees, knowingly and intentionally receive payment on behalf of Medicaid recipients and utilize the payment to benefit the corporation, rather than the Medicaid eligible patient.

107.    The State of Texas and its Medicaid carriers, intermediaries and agents, unaware of Res-Care/Citadel's conversion of payments, paid and may still continue to pay these claims.

108.    As a result of Defendants' actions, the State of Texas and its Medicaid Program has been, and may continue to be, severely damaged.

**COUNT THREE**
**VIOLATION OF § 36.002(4) OF THE**
**TEXAS MEDICAID FRAUD PREVENTION ACT**

109.    Paragraphs 1 through 98 are incorporated into Count Three as if fully set forth below.

110.    This is an action brought by the State of Texas against Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel. Under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.002(4).

111.    Res-Care, through its wholly owned operating division, Citadel, their agents and employees, knowingly and intentionally made false statements of material fact concerning the operation of Res-Care/Citadel facilities in order that the facility would qualify for certification or recertification by the Medicaid Program. Res-Care, through its wholly owned operating division, Citadel, their agents and employees, also knowingly and intentionally made false statements of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

112.    The State of Texas and its Medicaid carriers, intermediaries and agents, unaware of the false statements of material fact concerning the operation of the Res-Care/Citadel facilities, continued to treat Res-Care/Citadel as a Medicaid-certified facility by authorizing payment for their claims.

113.    As a result of Defendants' actions, the State of Texas and its Medicaid program has been, and may continue to be, severely damaged.

## COUNT FOUR
## VIOLATION OF § 36.002(9) OF THE
## TEXAS MEDICAID FRAUD PREVENTION ACT

114.    Paragraphs 1 through 98 are incorporated into Count Four as if fully set forth below.

115.    This is a civil action brought by the State of Texas against Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel, under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.002(9).

116.    Res-Care through its wholly owned operating division, Citadel, their agents and employees, knowingly and intentionally conspired to defraud the state by obtaining an unauthorized payment from the Medicaid Program.

117.    The State of Texas and its Medicaid carriers, intermediaries and agents, unaware of the conspiracy to defraud, paid and may continue to pay these unauthorized payments.

118.    As a result of Defendants' actions, the State of Texas and its Medicaid Program has been, and may continue to be, severely damaged.

## COUNT FIVE
## VIOLATION OF § 36.002(2) OF THE
## TEXAS MEDICAID FRAUD PREVENTION ACT

119.    Paragraphs 1 through 98 are incorporated into Count Five as if fully set forth below.

120.    This is an action brought by the State of Texas against Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel, under the Texas Medicaid False Claim Act, TEX. HUM. RES. CODE ANN. § 36.002(2).

121.    Res-Care through its wholly owned operating division, Citadel, their agents and employees, knowingly and intentionally concealed or failed to disclose events that affect the right to receive payment under the Texas Medicaid Program.

122. The State of Texas and its Medicaid carriers, intermediaries and agents, unaware of the concealed or non-disclosed events made by Res-Care through its wholly owned operating division, Citadel, paid and may still continue to pay these false and misrepresented claims.

123. As a result of Defendants' actions, the State of Texas and its Medicaid Program has been, and may continue to be, severely damaged.

## COUNT SIX
## VIOLATION OF § 36.002(7) OF THE
## TEXAS MEDICAID FRAUD PREVENTION ACT

124. Paragraphs 1 through 98 are incorporated into Count Six as if fully set forth below.

125. This is an action brought by the State of Texas against Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel, under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.002(7)(b).

126. Res-Care through its wholly owned operating division, Citadel, their agents and employees, knowingly and intentionally have made claims under the Medicaid Program for services that are substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry.

127. The State of Texas and its Medicaid carriers, intermediaries and agents, unaware of the substantially inadequate or inappropriate service made by Res-Care through its wholly owned operating division, Citadel, paid and may still continue to pay for these substantially inadequate or inappropriate services.

128. As a result of Defendants' actions, the State of Texas and its Medicaid Program has been, and may continue to be, severely damaged.

## COUNT SEVEN
## VIOLATION OF TEXAS COMMON LAW

129. Paragraphs 1 through 98 are incorporated into Count Seven if fully set forth below.

130.   This is an action brought by the State of Texas against Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel, under the Texas Common Law.

131.   Res-Care through its wholly owned operating division, Citadel, their agents and employees, knowingly and intentionally have made material and false representations in reimbursement claims submitted to the State of Texas with knowledge of their falsity or a reckless disregard for their truth and with the intention that the State of Texas act upon those misrepresentations to its detriment. The State justifiably relied upon Defendants' misrepresentations and paid the Defendants money well in excess of what should have been paid.

132.   The State of Texas and its Medicaid carriers, intermediaries and agents, was unaware of the misrepresentations made by Res-Care through its wholly owned operating division, Citadel, and would not have paid the Defendants had it been supplied with truthful and accurate information.

133.   In addition, Defendants materially breached their contracts with the State of Texas.

134.   By receiving monies that they were not entitled to receive, Defendants have been wrongfully enriched and the State of Texas is entitled to recover monies wrongfully had and received by Defendants.

135.   As a result of Defendants' actions, the State of Texas and its Medicaid Program has been, and my continue to be, severely damaged.

**WHEREFORE**, State of Texas prays for judgment against Defendants as follows:

A.   that Defendants Res-Care, its various Educare entities, and Res-Care's wholly owned operating division, Citadel, be ordered to cease and desist from knowingly and intentionally violating the Texas Medicaid Fraud Prevention Act and committing unlawful acts as defined by TEX. HUM. RES. CODE ANN. § 36.002;

B.   that judgment be entered in the State's favor and against Defendants for:

---

(1)     restitution to the State for any monetary payment or in-kind benefit resulting from the Defendants' unlawful acts in an amount to be determined at trial after full discovery;

(2)     two times the value of that monetary payment or in-kind benefit; and

(3)     all applicable prejudgment interest,

as provided for in the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.052 (a)(1), (a)(2), and (a)(4);

C.     that the court assess the appropriate civil monetary penalties of not less than $1,000 nor more than $10,000 for each and every unlawful act committed by the Defendants' as provided for in the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.052 (a)(3)(B);

D.     that judgment be granted for the State of Texas and against Defendants for all attorneys' fees, costs, and expenses incurred by the State in the prosecution of this suit pursuant to the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.007;

E.     that judgment be granted for the State of Texas and against Defendants due to Defendants' knowing and intentional, material and false representations and the justifiable reliance by the State of Texas on those material and false representations in an amount to be determined at trial after full discovery; and

F.     that the State of Texas be granted such other and further relief as the Court deems just and proper.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

EDWARD D. BURBACH
Deputy Attorney General for Litigation

MARK TOBEY
Chief, Antitrust & Civil Medicaid Fraud Division

PATRICK J. O'CONNELL
Chief, Civil Medicaid Fraud Section

LARA L. SILVA
Texas Bar No. 24004777
MICHAEL WINGET-HERNANDEZ
Texas Bar No. 21769650
PATRICK J. O'CONNELL
Texas Bar No. 15179900
Assistant Attorneys General
Antitrust & Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1302 Telephone
(512) 499-0712 Facsimile

ATTORNEYS FOR THE STATE OF TEXAS

## CERTIFICATE OF SERVICE

This certifies that by fax and/or first class mail, postage prepaid, properly addressed, I served a copy of the foregoing *State of Texas' Second Amended Complaint* on the following parties:

### ATTORNEYS FOR DEFENDANTS

Thomas M. Melsheimer
Matthew E. Yarbrough
Natalie L. Terhune
Victor Johnson
Fish & Richardson, P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 292-4001
FAX: (214) 747-2091

W. Reid Witcliff
Graves Dougherty Hearon & Moody
515 Congress Avenue, Suite 2300
Austin, TX 78701
(512) 480-5656
FAX: (512) 480-5856

Attorney for Defendant
Citadel Management Group, L.L.C.

Attorneys for Defendants
Res-Care, The Citadel Group, Inc., et al.

### ATTORNEYS FOR RELATOR

Marc S. Raspanti
Michael A. Morse
Miller, Alfano & Raspanti, P.C.
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 972-6400
FAX (215) 981-0082

John Cochran
Cochran & Cochran, P.C.
100 Harborview Dr., PH3C
Baltimore, MD 21230
(410) 385-0780
FAX (410) 385-0780

### ATTORNEYS FOR UNITED STATES OF AMERICA

Donna Webb, Asst. United States Attorney
Affirmative Civil Enforcement
Burnett Plaza, Suite 1700
801 Cherry Street, Unit 4
Fort Worth, TX 76102-6897
(817) 252-5247
FAX (817) 978-6351

Michael F. Hertz
Joyce R. Branda
Sanjay Bhambhani
Attorneys, Department of Justice
Civil Division
601 D Street, N.W., PHB Room 9707
Washington, D.C. 20530
(202) 305-0546
FAX (202) 305-7797

Dated: May 27, 2004

LARA L. SILVA